**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**AT COVINGTON**

**CIVIL ACTION NO. 15-179-WOB-JGW**

**EMERALD INTERNATIONAL CORP.**                           **PLAINTIFF**

**VS.**                **MEMORANDUM OPINION AND ORDER**

**WWMV, LLC**                                                      **DEFENDANT**

Plaintiff Emerald International Corporation alleges that Defendant WWMV, LLC breached an agreement executed to settle a prior contract suit. Emerald also reasserts its contract claim based on the parties' original agreement as well as claims of breach of good faith and fair dealing, promissory estoppel, and unjust enrichment. The matter is presently before the Court on Emerald's motion for summary judgment (Doc. 18). Having previously granted Emerald's motion, the Court now issues the following Memorandum Opinion and Order.

### I. Factual and Procedural Background

Emerald is a coal broker that purchases coal from mining companies, processes it, and resells it. WWMV is a coal mining company, and Ralph Ballard is its controlling member. Shonk Land Company is a third-party that holds a lease on land referred to by the parties as the "Wildcat II reserve" or "Wildcat mine." In the past, WWMV has mined a portion of that land that it subleased from Shonk (Wildcat Sublease).

In May 2013, the parties entered into a purchase order contract (PO), under which WWMV agreed to sell, and Emerald agreed to purchase, 600,000 tons of coal in monthly deliveries of

30,000 tons from June 2013 to June 2015.[1] Upon execution of the PO, and pursuant to its terms, Emerald paid WWMV $500,000 against the purchase price for the coal. WWMV accepted the payment, failed to deliver any coal, and refused Emerald's demand for repayment.

Having not received any coal by a year later, Emerald filed suit against WWMV in May 2014, alleging breach of contract and related equitable claims. In December 2014, this Court granted partial summary judgment in Emerald's favor, holding that WWMV materially breached the PO agreement by failing to supply any coal, that Emerald was entitled to rescind the contract and recover its $500,000 payment, and that the PO entitled Emerald to its attorney fees. *Emerald Int'l Corp. v. WWMV, LLC*, No. 2:14-cv-109-DLB-JGW, 2014 WL 7358846, at *6–11 (E.D. Ky. Dec. 23, 2014). However, other claims remained in the action, and before the case reached a final resolution on the merits, the parties executed a confidential "Settlement Agreement and Release" in April 2015.[2] Following a stipulation of dismissal by the parties, the Court dismissed Emerald's prior complaint, without prejudice.

WWMV's principal obligation under the settlement agreement was to deliver to Emerald $530,000 of coal, the value of which was to be determined by reference to a specified price index.[3] WWMV was required to deliver coal of the specified quality in approximately equal shipments of $176,000 in each of the second, third, and fourth quarters of 2015. If WWMV breached prior to

---

[1] At the time the parties executed the PO, WWMV did not have its Wildcat Sublease. Therefore, the initial transaction for the purchase of 600,000 tons of coal did not specify any particular source of the coal. However, the PO also provided that, once WWMV acquired its Wildcat Sublease, Emerald would have the exclusive and first right to purchase in a second transaction an additional 600,000 tons of coal from WWMV, which was to come from that source. In prior litigation, WWMV argued its obligation to provide coal under the first transaction never arose because acquisition of mining rights to the Wildcat Sublease was a condition precedent to that obligation. Based on the plain language of the PO, the Court expressly rejected this argument, holding that the condition only referred to the second transaction. *Emerald Int'l Corp. v. WWMV, LLC*, No. 2:14-cv-109-DLB-JGW, 2014 WL 7358846, at *5–6 (E.D. Ky. Dec. 23, 2014).
[2] The parties intended the settlement agreement to be confidential, and it is filed under seal in this action. The Court notes that this Memorandum Opinion discusses only those portions of the confidential agreement that the parties have already disclosed in their publicly accessible filings on the present motion.
[3] The agreement also gave WWMV the right to pay the $530,000 balance in cash.

2

its full performance, the settlement agreement entitled Emerald to reinstate its prior claims arising from the PO and to recover its attorney fees incurred to enforce the settlement agreement.

During the second quarter of 2015 (the first quarter WWMV was scheduled to deliver coal under the settlement agreement), WWMV provided $106,612.35 of coal. The next quarter, Emerald made demands for adequate assurance of WWMV's ability to perform. Despite the demands, WWMV never delivered more coal or cash to satisfy the remaining $423,387.65 of the obligation. When WWMV failed to perform, Emerald filed the present action for breach of the settlement agreement as well as each of the claims asserted in the prior litigation.

## II. Analysis

WWMV argues that, because several events beyond its control prevented it from providing Emerald with coal, a force majeure provision incorporated from the PO agreement excuses its nonperformance. Emerald argues the force majeure provision is not part of the settlement agreement. In the alternative, Emerald argues that none of the events proffered by WWMV trigger the force majeure provision. Because the settlement agreement clearly provides that WWMV was required to provide specified amounts of coal during specified periods of 2015, and WWMV acknowledges that it failed to do so, Emerald is entitled to summary judgment unless the force majeure provision excuses WWMV's nonperformance.

In Kentucky, the interpretation of a contract is an issue of law for the court. *FS Investments, Inc. v. Asset Guar. Ins. Co.*, 196 F. Supp. 2d 491, 497 (E.D. Ky. 2002). The "court may not resort to extrinsic or parol evidence concerning the parties' intentions" unless the language at issue is ambiguous. *Kentucky Spirit Health Plan, Inc. v. Commonwealth Fin. & Admin. Cabinet*, 462 S.W.3d 723, 728 (Ky. Ct. App. 2015), *review denied* (Apr. 27, 2016); *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 384 (Ky. 2002). Where the language at issue is

3

unambiguous, the court must apply its ordinary meaning and may not look beyond "the four corners of the document to determine the parties' intentions." *Nature Conservancy, Inc. v. Sims*, 680 F.3d 672, 676 (6th Cir. 2012); *Kentucky Shakespeare Festival, Inc. v. Dunaway*, — S.W.3d – –, 2016 WL 3371085, at *3 (Ky. June 16, 2016).

A.  **The settlement agreement incorporated the force majeure provision from the PO.**

Where a contract contains "clear language expressing the incorporation of other terms and conditions," and the parties' signatures appear after this language, "the signer[s] agree[] to be bound by everything incorporated." *Dixon v. Daymar Colls. Grp., LLC*, 483 S.W.3d 332, 344 (Ky. 2015) (internal alterations omitted); *see also Asher v. Unarco Material Handling, Inc.*, No. 06-548-ART, 2011 WL 42999, at *4 (E.D. Ky. Jan. 6, 2011) ("Kentucky law permits the incorporation of terms from a first contract into a second contract, making the terms of the first contract enforceable against a party to the second contract.").

The force majeure provision on which WWMV relies appears only in the standard terms attached to the PO agreement. However, the settlement agreement provides that "[e]xcept as otherwise agreed [t]herein, delivery terms and contract terms [of the settlement agreement] shall be pursuant to the standard terms and conditions contained in [the PO agreement]." Emerald argues the language requiring delivery in equal shipments across the second, third, and fourth quarters of 2015 shows the parties "otherwise agreed" that no PO provisions inconsistent with that schedule would apply.

Emerald's argument is unpersuasive. The fact that the agreements establish a schedule for performance does not indicate that the schedule negates a valid legal excuse. The two provisions are not contradictory. WWMV was required to deliver coal on the agreed schedule unless it had a legal excuse to that performance, which could include a provision excusing performance upon specified events. Therefore, the force majeure provision from the PO agreement is a "contract

4

term" incorporated by reference into the settlement agreement.

**B.     The force majeure provision was not triggered because WWMV's proffered events did not *cause* its nonperformance.**

Parties are free to agree that specified events will excuse nonperformance of their obligations. *Kentucky Utils. Co. v. South E. Coal Co.*, 836 S.W.2d 392, 400 (Ky. 1992). The party claiming force majeure has the burden to prove the defense at trial. *In re Clearwater Nat. Res., LP*, 421 B.R. 392, 397 (Bankr. E.D. Ky. 2009). Therefore, Emerald may prevail by showing that, as a matter of law, WWMV cannot establish at least one of the elements of its defense.

The contract provision at issue states:

> **13. Force Majeure**. Buyer and Seller are excused from any failure or delay of performance of an obligation under the Agreement for one day for each day that the failure or delay of performance is caused by events or conditions beyond its reasonable control including, without limitation, failure or shortage of materials, supplies, or shipping facilities, acts of God, and acts, regulations, directives, or priorities of any governmental authority.

To invoke this provision, a party would need to show: (1) that an event occurred meeting the contract's definition of "force majeure," and (2) that event caused the party's failure to perform. Because it is dispositive of the issue, this analysis begins with causation.

WWMV argues that, pursuant to this provision, four events excuse its failure to deliver Emerald's remaining coal: (1) a May 2015 administrative order; (2) extensive past mining of WWMV's sublease; (3) inability of WWMV to obtain permission to mine alternative areas using its preferred method; and (4) decline of the coal market.

For the provision to apply, the events raised by WWMV must have *caused* its failure to perform its obligations *as explained in the settlement agreement*. However, even accepting as true all of WWMV's representations regarding its four proffered events, a reasonable jury considering the plain language of WWMV's obligations could not find any of these events caused WWMV's failure to provide Emerald $530,000 of coal. While some of the events were certainly beyond

5

WWMV's control, its conclusion that those events caused its nonperformance relies entirely on an erroneous interpretation of the agreements. WWMV bases its arguments on the premise that both the PO agreement and the settlement agreement require WWMV to provide coal mined only from its Wildcat Sublease and only by the highwall mining method.

In support of WWMV's opposition to summary judgment, its controlling member Ralph Ballard provided an affidavit swearing to the following facts. Under both the PO and settlement agreement, "The Parties have agreed and understood that WWMV, LLC would supply coal to Emerald from the Wildcat II reserve by highwall mining [WWMV's sublease]." The highwall method requires cutting down trees in the area to be mined, but approximately one month after the parties entered the settlement agreement, the government issued an order prohibiting for five months the cutting of trees on an area that included WWMV's sublease. Although trees had already been cleared from some of the land, once that area was mined, WWMV could not continue mining its sublease for the duration of the order.[4] When WWMV was last able to mine its sublease, it also encountered "extensive, prior underground mining." Ballard swore that these conditions "made it unreasonable, impractical, more expensive and unsafe physically and environmentally, to continue mining the reserve." Since the time the settlement agreement was executed, the only land on which WWMV has held a legal right to mine was its sublease, and Shonk would not give permission to highwall mine other areas of the Wildcat II lease. Ballard admits that Shonk would allow mining on other areas using the mountaintop removal method. But Ballard claims that it "is questionable" whether WWMV could get the permits for that method, and WWMV "does not believe those [alternate] reserves can be mined economically by mountaintop removal, as the ratio of overburden to coal is far too high." Finally, Ballard swore

---

[4] WWMV admits the government's order has expired. Assuming there were no extensions to the order's duration, it expired in October 2015.

6

that a continued decline in the coal market has "made it impossible based upon presently permitted and available reserves [for WWMV] to obtain access to coal meeting the specifications required by Emerald."

Based on these circumstances, WWMV argues that the administrative order should extend by five months its obligation to supply the coal, and the other events warrant further extensions. If WWMV's premise was correct—that the agreements required coal only from a particular parcel of land and using a particular mining method—WWMV's conclusion might have merit. Indeed, the force majeure provision expressly includes government regulations. Therefore, if the coal was required to come only from WWMV's sublease and only by the highwall mining method, but WWMV either: (1) was legally prohibited from mining that area by that method, or (2) was unable to obtain coal from the area because past mining completely depleted the supply, then force majeure may have applied.

However, WWMV's position is contradicted by the plain language of the contract, which unambiguously described WWMV's obligation without reference to where, or by what method, it was to obtain the required coal. Under the heading "Delivery of Coal," the settlement agreement provided: "WWMV promises to deliver coal valued at $530,000," based on a specified price index and meeting a specified quality. The agreement also provided that WWMV was to supply the coal on a specific delivery schedule and that it had the right to pay cash to satisfy the obligation.

Neither WWMV's briefing nor Ballard's affidavit refer to any language from the settlement agreement to support WWMV's position that the contract required it to supply coal mined by any particular method or from any particular area. This is not surprising because no such language exists. The settlement agreement does not once mention the highwall mining method, the Wildcat II reserve, land controlled by Shonk, or land for which WWMV had an existing lease.

7

Because the plain language of the obligation places no limitations on the mining method or source of the coal, it clearly allows WWMV to obtain the coal by any means possible. Nothing in the settlement agreement even hints at a requirement or understanding that the coal must come from WWMV's Wildcat Sublease or from the highwall mining method. Although the settlement agreement also incorporates the standard terms and conditions attached to the PO agreement, those standard terms come no closer to supporting WWMV's position. Nothing in the standard terms suggests WWMV's obligation requires anything more specific than $530,000 of coal meeting the quality specifications, meaning WWMV was permitted to acquire it by any means. Because the settlement agreement unambiguously allows the coal to be provided from any source and by any method, the Court may not rely on Ballard's affidavit to divine the parties' contractual intent.

WWMV's representation of its contractual obligation is further belied by the fact that the parties already litigated a nearly identical issue before this Court in their prior litigation concerning the PO agreement. There, WWMV made the same argument that, based on the language of the PO agreement, the coal could come only from its Wildcat Sublease. The Court expressly rejected this argument, finding that the relevant section of the PO "sa[id] nothing of the Wildcat mine, or any other mine for that matter; rather, the source of the coal [was] left unspecified. . . . [Therefore, WWMV] promise[d] to supply 600,000 net tons of coal . . . regardless of its source." *Emerald Int'l*, 2014 WL 7358846 at \*4–5. In light of this prior treatment of WWMV's position, if the parties did nonetheless intend for WWMV to produce coal only from its sublease and only by highwall mining, it seems inconceivable that WWMV would execute the settlement agreement without insisting that the language reflect that requirement thoroughly and unambiguously. This is especially true because both agreements require that any disputes be resolved in the Eastern District of Kentucky, so WWMV knew it might end up back in front of the very court that

8

previously rejected its position. The fact that WWMV entered a settlement agreement that in no way mentioned the Wildcat II reserve or highwall mining strongly indicates that it is not accurately representing its obligations at this time.

Even though neither contract in this case suggests the coal had to come from WWMV's sublease or from highwall mining, WWMV may still have an argument if coal of the quality specified in the settlement agreement was not available in any other location or by any other method. However, WWMV makes no such argument. In fact, Ballard makes several statements representing that WWMV has made some efforts to acquire the coal from elsewhere, though it appears to be unwilling to use a different mining method. For example, where Ballard mentioned in his affidavit that Shonk would permit WWMV to use the mountaintop removal method to mine certain areas, Ballard did not suggest that method could not produce the required quality of coal, but simply stated that WWMV felt the ratio between its burden in using that method and the coal it could produce by that method was too high. These statements indicate that WWMV could, in fact, have acquired coal of the required specifications, even if it was more costly for it to do so.

Also concerning the costs of producing coal, WWMV argues that a decline in the coal market has caused its inability to perform. WWMV fails, however, to explain how a declining coal market would affect the *availability* of coal. A decline may cause mining $530,000 of coal to be more costly and less profitable for WWMV, but the *quality* or the *quantity* of coal available to mine would not change. WWMV has failed to make any persuasive argument that a decline in the coal market can fairly be said to *cause* its inability to obtain the coal.

Further, even if the Court was convinced that market conditions caused WWMV's inability to perform, a change in the market does not amount to a force majeure event where the parties have agreed to price terms that assume the market risks. *See In re Clearwater*, 421 B.R. at 397–98

(By entering into a fixed-price contract, parties to that agreement "expressly assumed normal market risks, such as a downturn in the coal market and a reduction in demand and/or coal prices."); *Northern Indiana Pub. Serv. Co. v. Carbon Cty. Coal Co.*, 799 F.2d 265, 275 (7th Cir. 1986) ("A force majeure clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed-price contract is that the market price will change."). Although WWMV attempts to distinguish a fixed-price term from the index-based term in the case at hand, both pricing methods involve similar assumptions of risk that the market will change. *See Kentucky Utils.*, 836 S.W.2d at 398 ("It is obvious to this Court that neither [party] desired in the long term coal supply agreement to be willing to subject themselves *to the risks typically associated with a pure market contract* or to the converse, an agreement that made no recognition of market prices." (Emphasis added)). Under an index-based price term, an increase in the price of coal would benefit WWMV because it could satisfy its $530,000 obligation with a substantially smaller amount of coal, time, labor, and other expense. A decrease in the price of coal would disadvantage WWMV because it would have to exhaust extra time, labor, and expense in order to produce the larger quantity of coal that amounted to a $530,000 value. WWMV is a sophisticated party, within the coal industry. It assumed the risk of market changes when it agreed to use a pricing index to value the coal. Therefore, it cannot now argue the market change is a force majeure event beyond its reasonable control.[5]

Because, among other failings, none of WWMV's proffered events could reasonably be found to have caused its failure to provide Emerald with coal to the specifications contained in the

---

[5] As a final point, the Court notes that even if the force majeure provision was triggered in this case, that provision contained a protection for a party who, because of an extended force majeure event, was not receiving the benefit of the promises made to it under the agreement: "Should the force majeure event or condition continue more than thirty (30) days following the onset thereof, the other party may terminate this Agreement." Therefore, as Emerald points out, it had the right to cancel the settlement agreement under this provision, which would then entitle it to pursue its claims from the prior action as though the parties never entered the settlement agreement.

settlement agreement, the force majeure provision is not triggered in this case. WWMV has provided Emerald with only 20% of the coal required under the settlement agreement. The period for performance under that contract has expired, and WWMV has given no indication that it plans to deliver the required coal any time in the near future. Because this nonperformance is not excused, WWMV is liable for its breach of the settlement agreement in the amount remaining on the obligation, $423,387.65 plus interest.

**C.     Emerald is entitled to its attorney fees under the settlement agreement.**

The settlement agreement also provides that, in the event of WWMV's breach, Emerald is entitled to "those attorneys' fees incurred by Emerald to enforce the settlement agreement." Kentucky law allows the award of reasonable attorney fees pursuant to the terms of a contract. *Nature Conservancy*, 680 F.3d at 677–79. Based on the contract provision, the Court holds that Emerald is entitled to its reasonable attorney fees incurred to enforce the settlement agreement. Emerald shall file an appropriate motion for these fees.

**D.     Remaining Claims**

Having granted summary judgment in Emerald's favor on its breach claim under the settlement agreement, Emerald cannot also recover damages for the same principal injury under the PO agreement or through the equitable claims of promissory estoppel or unjust enrichment. Neither has Emerald made a showing of the dishonesty, deceit, fraud, or seizure of an advantageous business opportunity required to recover for breach of good faith and fair dealing. *See Combs v. Int'l Ins. Co.*, 163 F. Supp. 2d 686, 696 (E.D. Ky. 2001). Therefore, Emerald's remaining claims are denied.

### III.  Conclusion

Therefore, having heard from the parties and being otherwise sufficiently advised, as explained above and during the hearing on this matter, **IT IS ORDERED** that:

(1)     Plaintiff's motion for partial summary judgment (Doc. 18) based on its claim for breach of the settlement agreement is, hereby, **GRANTED**;

(2)     Plaintiff's motion for partial summary judgment (Doc. 18) based on its remaining substantive claims is, hereby, **DENIED**;

(3)     Plaintiff shall file a motion for attorney fees and costs supported by appropriate documentation;

(4)     A separate judgment will enter accordingly.

This 15th day of August, 2016.



Signed By:
*William O. Bertelsman*  WOB
United States District Judge

12